1 F.3d 1419
 144 L.R.R.M. (BNA) 2040, 125 Lab.Cas. P 10,801
 LOCAL 30, UNITED SLATE, TILE AND COMPOSITION ROOFERS, DAMP
AND WATERPROOF WORKERS ASSOCIATION, AFL-CIO,
Petitioner in No. 92-3416,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Gundle Lining Construction Corporation, Intervenor-Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner in No. 92-3498,
v.
LOCAL 30, UNITED SLATE, TILE AND COMPOSITION ROOFERS, DAMP
AND WATERPROOF WORKERS ASSOCIATION, AFL-CIO, Respondent.
 Nos. 92-3416, 92-3498.
 United States Court of Appeals,
Third Circuit.
 Argued March 29, 1993.
Decided August 11, 1993.
 
 Thomas H. Kohn (argued), Sagot, Jennings & Sigmond, Philadelphia, PA, Attorney for Local 30, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, AFL-CIO.
 Aileen A. Armstrong, Yvonne T. Dixon, John Fawley (argued), Jerry M. Hunter, Nicholas E. Karatinos, Howard E. Perlstein, N.L.R.B., Washington, DC, for N.L.R.B.
 Laurance E. Baccini, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, PA, for Gundle Lining Const. Corp.
 OPINION OF THE COURT
 Before: SLOVITER, Chief Judge, COWEN and NYGAARD, Circuit Judges.
 SLOVITER, Chief Judge.
 
 
 1
 Local 30, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, AFL-CIO (Local 30, the Union or Roofers) petitions this court for review of the decision and order of the National Labor Relations Board (the Board) of July 20, 1992 finding that Local 30 violated the National Labor Relations Act (the NLRA or the Act) by (1) picketing with an object of coercing Gundle Lining Construction Corporation (Gundle or the Employer) to reassign work being performed by another union, and (2) maintaining a section 301 suit against Gundle following the Board's decision in a section 10(k) proceeding to assign the disputed work to Local 172, Laborers International Union of North America, AFL-CIO (Local 172 or Laborers). This appeal has been docketed here as No. 92-3416. The Board cross-applies for enforcement of its order, docketed at No. 92-3498. We consider these appeals together. In a separate appeal, Gundle appeals from the decision of a federal district court confirming an arbitration award in favor of Local 30 and against Gundle. This appeal, docketed at No. 92-1614, is considered in a separate opinion.
 
 I.
 Facts and Procedural History
 
 2
 Gundle is a manufacturer and installer of high-density polyethylene linings at landfills. After it was awarded the job of lining cells (particular areas of a landfill into which garbage is placed) at the Ocean County Landfill in Lakehurst, New Jersey, it entered into a Memorandum Agreement with Local 30 on November 18, 1988 providing that employees represented by Local 30 would perform the cell lining work at that landfill and that Gundle would abide by the terms of Local 30's collective bargaining agreement with the Roofing and Sheet Metal Contractors' Association of Philadelphia and Vicinity (RSMCA) "as of 11/18/88 through completion." App. at 2269. This entailed hiring employees selected through Local 30's hiring hall. Until the fall of 1989, Local 30 performed all of Gundle's cell lining work at the Ocean County Landfill.
 
 
 3
 In the fall of 1989, Gundle bid for and was awarded another cell lining job at the Ocean County Landfill, which Gundle assigned to Local 172. According to Michael Sullivan, Gundle's Project Manager at that time, Gundle had decided not to use Local 30 for any subsequent work at the Ocean County Landfill because the landfill's developer expressed dissatisfaction with Local 30's work. On November 6, 1989, Gundle and Local 172 executed a project agreement and Local 172 began work at the Ocean County Landfill.
 
 
 4
 Coincidentally, also on November 6, 1989, there was a hearing at the RSMCA in Philadelphia on Local 30's grievance regarding Gundle's use of its own unrepresented employees to perform cell lining work at a landfill in Tullytown, Pennsylvania (the Tullytown Landfill). At that time, Thomas Pedrick, President of Local 30, learned that Gundle was again working at the Ocean County Landfill. Pedrick questioned Sullivan, who confirmed that information. Because of the Tullytown Landfill situation, Pedrick assumed that Gundle was using its own unrepresented employees at the Ocean County Landfill.[1]
 
 
 5
 Two days later, on November 8, 1989, four persons wearing Roofers' jackets picketed the Ocean County Landfill, carrying signs which stated that Gundle did not pay union and area wages. After several hours and at the request of the landfill owner, the Local 172 workers left the work site. Shortly thereafter, the picketing ceased and it never resumed. According to Pedrick, the picketing ceased once he discovered that employees represented by Local 172, not Gundle's own unrepresented employees as he had previously assumed, were performing the work. He explained the cessation on the ground that, "[i]t wouldn't have been an area wage and standard picket line" if Local 172 had been working at the site. App. at 1060-61. The Local 172 workers returned to the site approximately one week later and finished the project without interruption.
 
 
 6
 Tony Priesol, Gundle's Vice-President of Construction, called Pedrick within the next two weeks and asked why Local 30 had picketed. Priesol testified that Pedrick responded by asking him why Gundle was using employees represented by Local 172 when "basically that was [Local 30's] work." App. at 2116-17.[2]
 
 
 7
 On November 13, 1989, Gundle filed an unfair labor practice charge against Local 30, alleging that the picketing had the objective of seeking the reassignment of the work in violation of section 8(b)(4)(ii)(D) of the NLRA.[3] After holding a hearing pursuant to section 10(k) of the Act,[4] the Board determined on June 28, 1990 that both Local 30 and Local 172 had legitimate contractual claims to the work. It then considered other factors, including employer preference and past practice, area and industry practice, relative skills, and the economy and efficiency of operations, in reaching its decision to award the work to Local 172. See Local 30, United Slate, Tile & Composition Roofers, 298 N.L.R.B. 951, 953-54, 1990 WL 122489 (1990). This procedure followed the Supreme Court's instruction to the Board in NLRB v. Radio & Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 578-80, 81 S.Ct. 330, 333-35, 5 L.Ed.2d 302 (1961), to decide on the merits jurisdictional disputes between unions with conflicting contractual claims and thereafter award the disputed work.
 
 
 8
 Meanwhile, on November 14, 1989, the day after Gundle filed its unfair labor practice charge, Local 30 informed Gundle that it believed that Gundle had violated the applicable RSMCA collective bargaining agreement. Gundle responded that its contract with Local 30 had expired on January 27, 1989 upon the completion of the job Local 30 was performing when the Memorandum Agreement was signed. On December 5, 1989, Local 30 filed a grievance alleging that Gundle breached the collective bargaining agreement by failing to hire through Local 30's hiring hall and to pay the wages and fringe benefits required by the collective bargaining agreement. The RSMCA notified Gundle that its Joint Conference Board (JCB) would hear Local 30's grievance on January 3, 1990. Gundle responded that because its contract with Local 30 expired before the disputed work commenced, the JCB lacked jurisdiction over Gundle and it would not participate in the hearing or recognize or be bound by the JCB's decision
 
 
 9
 On January 17, 1990, the JCB sustained Local 30's grievance, concluding that Gundle "continued to be bound by the labor contract at least until the completion of its work at the Ocean County Landfill." App. at 2281. It directed Gundle to "make whole those individuals who were deprived of work opportunities, including the payment of dues, wage and benefit fund contributions required by the labor contract." App. at 2281. On March 26, 1990, Local 30 filed a complaint in federal district court under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 185 (1988), seeking an order requiring Gundle to comply with the arbitration award.
 
 
 10
 As noted above, the Board resolved the section 10(k) dispute in favor of Local 172 on June 28, 1990. On December 14, 1990, the Board issued a complaint against Local 30 alleging that its picketing of the Ocean County Landfill and its continued maintenance of the section 301 suit after the Board's section 10(k) decision were unfair labor practices in violation of section 8(b)(4)(ii)(D) of the NLRA.[5] After a hearing, the Administrative Law Judge (ALJ) ordered the complaint dismissed.
 
 
 11
 On June 30, 1992, while the General Counsel's appeal to the Board was still pending, the district court granted summary judgment for Local 30 in the section 301 suit, holding that Gundle's failure to move to vacate the arbitration award within the applicable thirty-day statute of limitations barred it from raising any affirmative defenses to Local 30's motion to confirm the award. See United Union of Roofers, Waterproofers, & Allied Workers, Local Union No. 30 v. Gundle Lining Constr. Corp., 1992 WL 164465, 1992 U.S.Dist. LEXIS 9153, 141 L.R.R.M. (BNA) 2377, 2380 (E.D.Pa.1992).
 
 
 12
 On July 20, 1992, the Board reversed the ALJ's dismissal of the unfair labor practice complaint. See Local 30, Union Slate, Tile & Composition Roofers, 307 N.L.R.B. No. 234, 141 L.R.R.M. (BNA) 1047, 1992 WL 187060 (1992). The Board found that Local 30 had committed unfair labor practices by picketing and maintaining its section 301 suit, and it ordered Local 30 to withdraw its section 301 lawsuit and to reimburse Gundle for any payments it may have made to Local 30 for the disputed work.
 
 
 13
 Local 30 filed this petition for review of the Board's decision and the Board filed a cross-application for enforcement of its decision. We have jurisdiction under 29 U.S.C. Sec. 160(f) (1988).
 
 
 14
 Our review of decisions of the Board is circumscribed. We review factual findings to determine whether they are supported by substantial evidence on the record as a whole. See NLRB v. Rockwood Energy & Mineral Corp., 942 F.2d 169, 173 (3d Cir.1991). We must enforce a Board order that rests upon an interpretation of the Act that is not "an unreasonable or unprincipled construction of the statute...." Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); International Bhd. of Elec. Workers, Local 803 v. NLRB, 826 F.2d 1283, 1287 (3d Cir.1987).
 
 II.
 Discussion
 
 15
 At issue in this case is whether and how the Board may enforce its section 10(k) determination that Local 172 rather than Local 30 was entitled to the work assignment at the Ocean County Landfill. The Board acquired section 10(k) jurisdiction after Gundle filed an unfair labor practice charge under section 8(b)(4)(ii)(D) because of Local 30's picketing at the Ocean County Landfill site. It is the Board's position that its section 10(k) determination took precedence over the contrary arbitration award granting Local 30 damages for Gundle's failure to assign it the work that was assigned to Local 172 by the Board. Therefore, according to the Board's opinion, Local 30's continued maintenance of its section 301 suit against Gundle to enforce the arbitration award after the section 10(k) determination "directly undermine[d] the 10(k) award which, under the congressional scheme, is supposed to provide a final resolution to the dispute over which group of employees are entitled to the work at issue." Local 30, 141 L.R.R.M. at 1048, 1992 WL 187060.
 
 
 16
 As the Supreme Court explained in NLRB v. Plasterers' Local Union No. 79, Operative Plasterers' and Cement Masons' International Association, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971), an unfair labor charge under section 8(b)(4)(ii)(D) "must be read in light of Sec. 10(k) with which it is interlocked." Id. at 123, 92 S.Ct. at 365. Issuance of a complaint on a section 8(b)(4)(ii)(D) charge must be withheld until the Board acts pursuant to section 10(k) to "hear and determine" the underlying dispute.[6] However, a section 10(k) decision is not itself enforceable; a decision under that section, "standing alone, binds no one." Id. at 126, 92 S.Ct. at 367. Instead, "the impact of the Sec. 10(k) decision is felt in the Sec. 8(b)(4)(ii)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding." Id. at 126-27, 92 S.Ct. at 367.
 
 A.
 The Lawfulness of the Picketing
 
 17
 Local 30 concedes that if one object of the picketing is to coerce an employer to assign work to employees represented by the picketing union rather than to employees represented by another union, there has been a violation of section 8(b)(4)(ii)(D). Petitioner's Br. at 18 (citing Teamsters, Chauffeurs & Helpers, Local Union No. 50 (Schnabel Found. Co.), 295 N.L.R.B. 68, 69 (1989)). It argues, however, that this rule is inapplicable here because it had no "advance notice" that the disputed work at the Ocean County Landfill was being performed by members of another union rather than unrepresented workers, as Pedrick testified he believed.[7]
 
 
 18
 The Board did not consider this argument. Instead, the Board held that the picketing was an unfair labor practice. Although the ALJ concluded that the picketing was not unlawful because Local 30 "never sought through its picketing to claim the work from [Local 172] but only to cure the violation of its contract," App. at 3008, in reaching a different conclusion the Board relied on the ALJ's finding, inter alia, that Local 30 picketed because employees it represented were not assigned the disputed work and in order to advance its contractual claim to wages for employees not hired to perform the disputed work. Thus, the Board held that Local 30's picketing violated sections 8(b)(4)(i) and (ii)(D) "[b]ecause an object of the ... picketing was to coerce the Employer to reassign the disputed work to employees the Roofers represent...." Local 30, 141 L.R.R.M. at 1048, 1992 WL 187060.
 
 
 19
 Local 30 argues that its sole objective in picketing the Ocean County Landfill was to publicize the fact that Gundle was not paying its employees in accordance with area standards--a lawful objective under the Act.[8] It notes that its picket signs referred to the wages as being below area standards, that it ceased picketing immediately once it learned that the employees were represented by another union, and that it had a prior dispute with Gundle over Gundle's hiring of its own employees for much lower wages to do work at the Tullytown Landfill.
 
 
 20
 The law is clear that a single unlawful objective, even if it accompanies other lawful objectives, is sufficient to make picketing unlawful under the Act. See NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 951, 95 L.Ed. 1284 (1951); NLRB v. Musicians Union, AFM Local 6, 960 F.2d 842, 845 (9th Cir.1992); Schnabel Found. Co., 295 N.L.R.B. at 70. Thus, the issue is not whether Local 30's professed purpose of protesting the perceived area standards violation is supported by the evidence, but whether the Board's finding that the picketing had an unlawful objective, even if not the sole objective, of seeking the reassignment of the work is supported by substantial evidence on the record as a whole.
 
 
 21
 The facts referenced by the Board to support its finding that Local 30's picketing had an unlawful objective include: (1) two days before the picketing Pedrick protested Gundle's failure to hire employees represented by Local 30 to perform the work that he believed was covered by Local 30's contract with Gundle; and (2) Pedrick stated shortly after the picketing occurred that the work "basically ... was his [Roofers'] work." Local 30, 141 L.R.R.M. at 1047, 1992 WL 187060. The Board also cited to the ALJ's finding that Local 30 "was aggrieved that it was not given the job and its workers were deprived of employment...." Id. at 1048, 1992 WL 187060.
 
 
 22
 Making the factual determination of a union's intended objective in picketing is "inferential and fact-based ..., at times requiring the drawing of lines more nice than obvious." NLRB v. International Longshoremen's Ass'n, 473 U.S. 61, 81, 105 S.Ct. 3045, 3057, 87 L.Ed.2d 47 (1985) (internal quotation omitted). "[A] reviewing court may not displace the Board's factual inferences even if the court would have reached a different conclusion on de novo review." NLRB v. Omnitest Inspection Servs., Inc., 937 F.2d 112, 121 (3d Cir.1991). "If more than one inference may be drawn from a given set of facts, ... the conclusion of the Board will control unless it is unreasonable." Hedstrom Co. v. NLRB, 629 F.2d 305, 316 (3d Cir.1980) (in banc), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981).
 
 
 23
 Although none of the evidence cited by the Board specifically links the picketing to Local 30's work assignment dispute, none of the evidence cited by the ALJ or Local 30 directly undermines the Board's inference and conclusion that they were related. Essentially, the Board drew different inferences from the substance of the evidence than did the ALJ. As we stated in Hedstrom, "we have consistently held that the Board has the power to draw different conclusions from evidentiary facts presented to the ALJ, including conclusions that directly contradict those reached by the ALJ." Id. We cannot conclude on the basis of the record that the Board's inferences are unreasonable or inconsistent with its own precedents. See, e.g., Painters & Drywall Finishers, Local No. 79 (O'Brien Plastering Co.), 213 N.L.R.B. 788, 1974 WL 5349 (1974) (finding reasonable cause to believe unfair labor practice committed where picketing followed union's assertion that the work was theirs and led to work stoppages, even though union contended sole purpose was to protest substandard wages).
 
 
 24
 Pedrick's assumption that the workers at the Ocean County Landfill were unrepresented by any union does not dictate a different result. The purpose of the Act is to protect employers and the public from the detrimental economic impact of work stoppages arising out of picketing over jurisdictional disputes. See Plasterers' Local Union No. 79, 404 U.S. at 130, 92 S.Ct. at 369. It would subvert that purpose if a union could avoid the applicability of section 10(k) by picketing before making any inquiry, which in this case would have revealed that the workers were in fact represented by another union. See NLRB v. Building & Constr. Trades Council, 578 F.2d 55, 58 (3d Cir.1978) (failure to "make substantial efforts to obtain information as to whether the [employer's] wages or benefits met area standards" undermines asserted area standards objective and supports Board's finding of unlawful objective).
 
 
 25
 Regardless of whether we would reach the same conclusion as the Board upon a de novo review of the record, we hold, after giving due deference to the Board's expertise in drawing factual inferences, that the Board's finding that the picketing had an unlawful objective is supported by substantial evidence.[9]
 
 
 26
 Nor can we conclude that the Board erred in holding that the ALJ's reliance on Teamsters Local 107, Highway Truck Drivers & Helpers (Safeway Stores, Inc.), 134 N.L.R.B. 1320 (1961), was misplaced. In Safeway Stores, the employer had transferred truck-driving jobs from the members of one union who had performed the work for over ten years to employees at a different plant who were represented by another union "which did not press Safeway for the work." The Board held that section 8(b)(4)(ii)(D) and section 10(k) were not designed to find a jurisdictional dispute "every time an employer elected to reallocate work among his employees or supplant one group of employees with another...." Id. at 1322. The Supreme Court has interpreted the "Safeway rule" as applying only where "the employer no longer faces conflicting claims to the work," see Plasterers' Local Union No. 79, 404 U.S. at 135, 92 S.Ct. at 371: in that situation, there is no jurisdictional dispute.
 
 
 27
 The Board in this case found Safeway Stores inapplicable because Local 30 did not represent a stable force of Gundle's employees but was only interested in securing work for hiring hall applicants on Gundle's new cell project. In its brief, it distinguishes on the same basis the other cases Local 30 cites. See Seattle Bldg. & Constr. Trades Council (Seattle Olympic Hotel Co.), 204 N.L.R.B. 1126, 1973 WL 4836 (1973); Chauffeurs, Teamsters & Helpers, Local 331 (Bulletin Co.), 139 N.L.R.B. 1391 (1962). Both of those cases concerned a union's effort to regain employment for its members who had traditionally performed the work rather than, as here, "competing claims between rival groups of employees." Safeway Stores, 134 N.L.R.B. at 1322.
 
 
 28
 The ALJ believed it was significant that the employer created the dispute by its work assignment decision. He suggested that[i]f the Board were to bar [Local 30's] activities and apply Section 10(k) standards to what is essentially a breach of contract, including the Board's primary reliance on the employer's preference, the Board would permit any employer to evade its collective-bargaining agreement by merely signing an agreement with another union and then assigning its work to that other union.
 
 
 29
 App. at 3010.
 
 
 30
 As the Board points out, the ALJ overstated the risk of invoking the Board's section 10(k) jurisdiction in a situation where the employer of its own accord enters into conflicting collective bargaining agreements. Under the Act it is clear that if neither union pickets or otherwise tries to coerce the employer into assigning it the work, section 10(k) will not be implicated. In contrast, here Local 30's picketing to obtain work assigned by the employer to another union triggered section 10(k) jurisdiction. We thus reject the union's contention that the Board erred as a matter of law in holding that Local 30's picketing was an unfair labor practice under section 8(b)(4)(ii)(D).
 
 B.
 Maintenance of the Section 301 Suit
 
 31
 In addition to finding that Local 30's picketing of the Gundle worksite was an unfair labor practice under section 8(b)(4)(i) and (ii)(D), the Board found that Local 30 violated section 8(b)(4)(ii)(D) of the Act by refusing to withdraw its section 301 action previously filed in federal court to confirm the arbitration award that it had received in its favor.[10] The Board found that by maintaining the section 301 suit after June 28, 1990, the date of the Board's section 10(k) determination awarding the work to Local 172, Local 30 "sought to undermine the Board's [section] 10(k) award and coerce the Employer into reassigning to [Local 30's] members the work that the Board found had been properly assigned to employees represented by [Local 172]." Local 30, 141 L.R.R.M. at 1049, 1992 WL 187060. We review to determine whether the Board's finding rests on a reasonable interpretation of the Act.
 
 
 32
 In Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 737 n. 5, 103 S.Ct. 2161, 2166 n. 5, 76 L.Ed.2d 277 (1983), the Supreme Court recognized that a lawsuit which "has an objective that is illegal under federal law" may be enjoined as an unfair labor practice.[11] Since that decision, other courts of appeals and the Board have agreed that the pursuit of a section 301 breach of contract suit that directly conflicts with a section 10(k) determination has an illegal objective and is enjoinable as an unfair labor practice under section 8(b)(4)(ii)(D). See, e.g., International Longshoremen's & Warehousemen's Union v. NLRB (ILWU), 884 F.2d 1407, 1414 (D.C.Cir.1989) (unfair labor practice to seek damages for work previously awarded to another union in a section 10(k) proceeding); Northern California Dist. Council Laborers Local Union No. 261 (W.B. Skinner, Inc.), 292 N.L.R.B. 1035, 1039, 1989 WL 223855 (1989) (unfair labor practice to maintain state court suit to enforce arbitration award for damages after Board has awarded work to other employees in a section 10(k) proceeding). As the court stated in International Union, United Automobile, Aerospace & Agricultural Implement Workers (UAW) v. Rockwell International Corp., 619 F.2d 580, 583 (6th Cir.1980), "[o]nce the NLRB decides a work assignment dispute, its determination takes precedence over a contrary arbitrator's award [of the work]."
 
 
 33
 We have applied the same principle in the representational context. In Chauffeurs, Teamsters, & Helpers Local 776 Affiliated with International Brotherhood of Teamsters v. NLRB, 973 F.2d 230, 236 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1383, 122 L.Ed.2d 758 (1993), the arbitrator found that the employer violated the union recognition clause in the collective bargaining agreement by failing to apply it to a particular group of employees. In a subsequent unit clarification proceeding initiated by the employer, the Board determined that the same group of employees was not part of the unit. Thereafter, the union sought to enforce the arbitration award in a section 301 suit filed in federal court.
 
 
 34
 In an unfair labor practice proceeding, the Board found that the union's maintenance of the section 301 suit after the Board's determination that the employees were excluded from the unit was an unfair labor practice in violation of section 8(b)(1)(A), (2) and (3) because the Board's unit clarification proceeding superceded the arbitrator's decision. We granted enforcement in reliance on the "illegal objective" test enunciated in Bill Johnson's. We stated, "[i]n this case the suit to enforce the arbitration award was prosecuted to circumvent the primary jurisdiction of the Board in deciding representational issues. Accordingly, regardless of the union's motivation, after [the Board's determination of the representation issue], the suit was being pursued for an illegal objective...." Id. 973 F.2d at 236. Significantly, we also noted that the union's "subjective good faith will not save it." Id.[12]
 
 
 35
 The crux of the issue before us is whether the arbitration award for Local 30 is inconsistent with or contrary to the Board's assignment of the work to Local 172. The Board commented on the sequence of events, noting that Local 30 had "fil[ed] a contract grievance after it was faced with an unfair labor practice charge." 141 L.R.R.M. at 1048, 1992 WL 187060. Local 30 emphasizes that by letter dated January 4, 1990, its counsel advised the Board that its "claim against [Gundle] under the provisions of its collective bargaining agreement is limited to a claim for monetary damages and does not involve any claim for the performance of the specific work set forth in the ... unfair labor practice proceeding." App. at 2404. Local 30 argues that it is not inconsistent with the Board's section 10(k) decision for it to seek payment for the disputed work by filing a grievance for breach of the collective bargaining agreement and seeking the enforcement of an arbitration award in court, so long as it is not seeking the work itself.
 
 
 36
 The distinction Local 30 seeks to draw between seeking the work and seeking payment for the work is ephemeral. In NLRB v. Local 1291, International Longshoremen's Association, 368 F.2d 107 (3d Cir.1966), cert. denied, 386 U.S. 1033, 87 S.Ct. 1482, 18 L.Ed.2d 595 (1967), we held that a jurisdictional dispute governed by section 10(k) was created by two groups of employees claiming pay for the same work, irrespective of whether either group was seeking the work itself. We explained:
 
 
 37
 the valuable part of a right to a particular job is the right to be paid for it. Thus, a jurisdictional dispute between two groups of employees as to which is entitled to certain work is in essence a dispute as to which shall receive compensation for that work. The opportunity sought to perform labor is significant only as a means of obtaining compensation. It follows that if workmen, who are entitled to a job under the terms of the labor contract, agree to forego the obligation of working but not the concomitant right to payment, they have not disclaimed any significant right. When, as in this case, one group insists that work, for which another group has contracted and is being paid, be assigned it, the fact that both groups are claiming pay for the same work suffices to create a jurisdictional dispute, and it is irrelevant that either group, or both, may manifest a willingness to take the pay and forego the work.
 
 
 38
 Id. at 110 (emphasis added). Any other result would be inconsistent with Carey v. Westinghouse Electric Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964), where the Supreme Court held that a Board ruling on a representational issue would protect the employer from liability for damages for breach of a collective bargaining agreement as long as the employer's actions were consistent with the Board's decision.
 
 
 39
 The Board, whose construction of the Act is entitled to deference, also has held that there is no material difference between seeking work and seeking payment in lieu of work, and its decisions embodying this principle have been enforced by other courts of appeals. For example, in ILWU, the court upheld the Board's conclusion that a union committed an unfair labor practice by filing and maintaining a grievance under its collective bargaining agreement seeking time-in-lieu payments for work that the Board had previously assigned to another union in a section 10(k) proceeding. 884 F.2d at 1413-14; see also International Longshoremen's & Warehousemen's Union, Local 32 v. Pacific Maritime Ass'n (Weyerhaeuser), 773 F.2d 1012, 1018-19 (9th Cir.1985) (upholding Board's determination that union's section 301 suit to enforce arbitrator's award of payment-in-lieu of work awarded to another union in a section 10(k) decision was an unfair labor practice), cert. denied, 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986); Rockwell International, 619 F.2d at 584 ("[W]hen an employer has been acting in accord with an ultimate NLRB Sec. 10(k) ruling, it is not liable for damages to the disappointed union.").
 
 
 40
 We recognize that the language in Hutter Construction Co. v. International Union of Operating Engineers, Local 139, 862 F.2d 641 (7th Cir.1988), supports Local 30's position. In Hutter, the Operators' union filed a grievance against the employer for breaching a clause of the collective bargaining agreement limiting subcontracting to a signatory of the agreement. The arbitrator awarded backpay to the Operators but the Board, in a section 10(k) decision, awarded the disputed work to the Laborers, the union used by the subcontractor. The court concluded that the Operators' subcontracting grievance was not a jurisdictional claim, and that the arbitrator's award of pay for the disputed work was separable from the section 10(k) award of the work itself and not inconsistent therewith.
 
 
 41
 Whether or not the holding in Hutter is distinguishable from the issue presented here, as the Board suggests, we do not accept the distinction made in that case between a section 10(k) award based on noncontractual factors and an arbitral award of damages based on a contractual claim to the work. See id. at 645. As we have already noted, section 10(k) proceedings are intended to resolve competing claims to work, even if both groups of employees claiming the work have legitimate contractual claims. In Radio & Television Broadcast Engineers, 364 U.S. at 578-79, 81 S.Ct. at 333-34, the seminal case on the effect of a section 10(k) award, the Supreme Court noted that "in most situations where jurisdictional strikes occur, the employer has contracted with two unions, both of which represent employees capable of doing the particular tasks involved." Id. at 582, 81 S.Ct. at 335. If in every case where the section 10(k) decision was based on noncontractual factors the disappointed union could still seek a contractual remedy, the section 10(k) hearing would not be serving its intended purpose of preventing work disruption by quickly and finally resolving jurisdictional disputes. See id. at 576-77, 81 S.Ct. at 332-33.
 
 
 42
 We also agree with the Board that if a union is permitted to recover damages for work awarded to another union in a section 10(k) proceeding, the policy underlying section 8(b)(4)(ii)(D) of protecting employers from the detrimental economic impact of jurisdictional disputes would be severely undermined. See ILWU, 884 F.2d at 1414 (noting that Board's interpretation "may even be inevitable" because otherwise "the very purpose of section 10(k)--to authorize the Board to resolve the jurisdictional dispute--would be totally frustrated"). Therefore, we conclude that the Board's interpretation of the Act to treat maintenance of the section 301 lawsuit to enforce an arbitration award against Gundle for pay-in-lieu of work as an unfair labor practice was not erroneous as a matter of law.[13]
 
 III.
 Conclusion
 
 43
 For the reasons set forth, we will grant enforcement of the Board's order and deny Local 30's petition for review.
 
 
 
 [1]
 Sullivan testified that in this conversation he told Pedrick that Gundle was using employees represented by Local 172. However, Pedrick testified to the contrary, and his testimony was credited by the ALJ. The Board accepted the ALJ's credibility finding in its decision
 
 
 [2]
 Although Priesol denied this, see App. at 1064, the ALJ never resolved that difference in the testimony as it did with the November 6, 1989 conversation. See supra note 1
 
 
 [3]
 Section 8(b)(4)(ii)(D) makes it "an unfair labor practice for a labor organization or its agents"
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work....
 29 U.S.C. Sec. 158(b)(4)(ii)(D) (1988).
 
 
 [4]
 Under section 10(k) of the Act,
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [section 8(b)(4)(ii)(D) ], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, [unless the dispute is resolved by the parties within 10 days].
 29 U.S.C. Sec. 160(k) (1988).
 
 
 [5]
 In a separate proceeding, the Board sought to enjoin the section 301 suit under the power given it in section 10(l ) of the NLRA to seek "appropriate injunctive relief pending the final adjudication of the Board" if the individual to whom the matter is referred has "reasonable cause to believe such charge is true...." See 29 U.S.C. Sec. 160(l ) (1988). The district court refused to issue the injunction, see Hoeber ex rel. NLRB v. Local 30, United Slate, Tile & Composition Roofers, 759 F.Supp. 212 (E.D.Pa.1991), and we affirmed on the ground that the district court "properly exercised its discretion in holding that a 10(l ) injunction would not be just and proper in this case." See Hoeber ex rel. NLRB v. Local 30, United Slate, Tile & Composition Roofers, 939 F.2d 118, 127 (3d Cir.1991)
 
 
 [6]
 The unfair labor practice charge is dismissed if the section 10(k) decision awards the disputed work to the union charged with an unfair labor practice or if the charged union complies with an adverse award. See International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers, 419 U.S. 428, 446, 95 S.Ct. 600, 611, 42 L.Ed.2d 558 (1975)
 
 
 [7]
 The premise of Local 30's argument, i.e., that section 10(k) and section 8(b)(4)(ii)(D) apply only to work assignment disputes between rival unions and not to disputes between a union and an unrepresented group of employees, is questionable. Although the Supreme Court has never directly addressed the issue, it has on two occasions expressed the view that section 10(k) and section 8(b)(ii)(4)(D) apply to jurisdictional disputes between a union and unrepresented employees. See NLRB v. Radio & Television Broadcast Eng'rs Union, Local 1212, 364 U.S. 573, 584, 81 S.Ct. 330, 337, 5 L.Ed.2d 302 (1961) (acknowledging "the fact that Sec. 10(k), like Sec. 8(b)(4)[ii](D), extends to jurisdictional disputes between unions and unorganized groups as well as to disputes between two or more unions"); Plasterers' Local Union No. 79, 404 U.S. at 128 n. 22, 92 S.Ct. at 368 n. 22 ("Section 10(k) protection was also extended to unorganized employees."). Other courts of appeals considering this issue have reached similar conclusions. See, e.g., NLRB v. International Longshoremen's Ass'n, 764 F.2d 234, 238 (4th Cir.1985) ("The essence of a jurisdictional dispute is that a union claims a right to work that is being performed by workers who may or may not be represented by another union."); NLRB v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Local No. 195, 574 F.2d 1215, 1218 (5th Cir.1978) (rejecting argument that section 8(b)(4)(ii)(D) applies only to jurisdictional disputes between rival unions). Local 30 cites no cases supporting its position that section 10(k) is limited to jurisdictional disputes between unionized employees, and we are aware of none
 
 
 [8]
 Local 30 also argues that the Board erred by rejecting the ALJ's finding, based on a credibility determination, that Local 30 did not know at the time it picketed that the work at the Ocean County Landfill was being done by a rival union and not by Gundle's own unrepresented employees. However, the Board did not disturb the ALJ's credibility determination or his finding on this issue. See supra note 1
 
 
 [9]
 We recognize that in Hoeber, where we affirmed the district court's exercise of discretion in refusing to enjoin the section 301 suit under section 10(l ), we expressed doubt that Local 30's picketing constituted an unfair labor practice. 939 F.2d at 123 n. 7. However, a section 10(l ) proceeding is independent of the proceeding on the merits and therefore any speculation expressed in that decision is not binding on us in the context of an appeal on the merits. See Denver Bldg. & Constr. Trades Council, 341 U.S. at 682-83, 71 S.Ct. at 948
 
 
 [10]
 In contrast, the mere filing of a grievance by a union before the Board issues its section 10(k) decision is not an unfair labor practice. See Georgia-Pacific Corp. v. NLRB, 892 F.2d 130, 133 (D.C.Cir.1989)
 
 
 [11]
 Local 30 argues that pursuing its section 301 suit to enforce the arbitration award is not an unfair labor practice because under Bill Johnson's a section 301 suit must lack a reasonable basis in fact or law and be filed with an improper motivation to be enjoinable as an unfair labor practice. We need not consider the merits of Local 30's argument because, as noted in the text, in Bill Johnson's the Supreme Court also recognized the "illegal objective" test referred to in the text as an independent basis for enjoining a lawsuit as an unfair labor practice
 
 
 [12]
 Nothing in our opinion in Eichleay Corp. v. International Association of Bridge, Structural & Ornamental Iron Workers, 944 F.2d 1047 (3d Cir.1991), cert. dismissed, --- U.S. ----, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992), relied on by Local 30, is to the contrary. Eichleay involved an employer's attempt to vacate an adverse arbitration award determining that it breached its collective bargaining agreement. We held that the portion of the award which implicated the Board's earlier representation determination was correctly vacated by the district court. That portion of the arbitration award that did not directly conflict with the Board's unit clarification decision could stand. The case did not concern the issue here--whether maintenance of a section 301 action that undermines a Board section 10(k) decision is an unfair labor practice. There was also no direct conflict between the Board's section 10(k) decision and the arbitration award at issue in Associated General Contractors, Inc. v. International Union of Operating Engineers, Local 701, 529 F.2d 1395 (9th Cir.), cert. denied, 429 U.S. 822, 97 S.Ct. 72, 50 L.Ed.2d 84 (1976), another case cited by Local 30
 
 
 [13]
 Again, our statement in Hoeber that because "Local 30 has disavowed any claim to the landfill work," and now seeks only damages for breach of contract, it did not have an improper motivation in filing the suit is not controlling, Hoeber, 939 F.2d at 124, especially because, as we clarified supra, we do not believe the improper motivation test is the only basis upon which a section 301 suit to enforce an arbitration award is enjoinable as an unfair labor practice